IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ADAM AKARSOY, individually and on behalf of similarly situated individuals,<br><br>*Plaintiff*,<br><br>v.<br><br>B. BRAUN MEDICAL, INC., a Pennsylvania Corporation,<br><br>*Defendant*. | Case No.<br><br>COMPLAINT – CLASS ACTION |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Adam Akarsoy, individually and on behalf of a class of similarly situated individuals, brings this Complaint and Demand for Jury Trial against B. Braun Medical, Inc. ("B. Braun"), for the increased risk of cancer it has caused to individuals living and working in the vicinity of its medical sterilization facility as a result of its emissions of toxic ethylene oxide into the community. Plaintiff alleges as follows upon personal knowledge as to himself and his own acts and experiences, and upon information and belief as to all other matters.

## INTRODUCTION

1. B. Braun operates an industrial medical manufacturing and sterilization plant in Allentown, Pennsylvania. As part of its sterilization process, B. Braun uses and emits ethylene oxide.

2. While ethylene oxide has been classified as a human carcinogen since 1994, and its carcinogenic and mutagenic properties have been well documented in studies since at least the mid-1980s, B. Braun disregarded ethylene oxide's harmful properties and continues to release it into the surrounding community—entirely unbeknownst to area residents and workers.

3. Self-reported emission estimates from the B. Braun facility indicate high levels of ethylene oxide release—B. Braun released as much as 8,960 pounds of ethylene oxide in a single year.

4. As a result, and unbeknownst to them, individuals living and working near the B. Braun facility face some of the highest long-term cancer risks in the United States. These individuals have been unknowingly inhaling ethylene oxide on a routine and continuous basis for decades. Now they are at an increased risk of developing a variety of cancers, reproductive issues, birth defects and other life-altering health effects from their exposure to ethylene oxide.

## PARTIES

5. Plaintiff Adam Akarsoy is a natural person and a citizen of the State of Pennsylvania.

6. Defendant B. Braun Medical, Inc., is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business located at 824 12th Avenue, Bethlehem, Pennsylvania 18018.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2), because (i) at least one member of the Class is a citizen of a different state than the Defendant, (ii) the amount in controversy exceeds, $5,000,000, exclusive of interests and costs, and (iii) none of the exceptions under that subsection apply to this action.

8. This Court has personal jurisdiction over Defendant because it is incorporated under the laws of this Commonwealth and carries on a continuous and systematic part of its business within this Commonwealth.

9. Venue is proper pursuant to 28 U.S.C. § 1391(b) because Defendant operates a facility in this District and a substantial part of the events or omissions giving rise to the claims of Plaintiff and the Class occurred in this District.

## COMMON FACTUAL ALLEGATIONS

### I. Brief Overview of the Ethylene Oxide Industry

10. Ethylene oxide ("EtO") is a flammable gas at room temperature that is produced in large volumes for industrial uses.

11. Commercial medical equipment manufacturers and sterilizers use ethylene oxide in their sterilization processes for over 20 billion health care products every year in the United States. The EtO sterilization process begins by placing medical equipment in a gas chamber. After air is pumped out of the room, ethylene oxide is introduced and allowed to diffuse into the products for several hours. Once the medical equipment is sterilized, the ethylene oxide is pumped out of the chamber and the remaining EtO is allowed to slowly dissipate.

12. Since at least 1988, Defendant B. Braun has used, and continues to use, EtO in its industrial medical device sterilization process.

13. Through this process, B. Braun emits EtO into the air allowing it to disburse and be carried by wind throughout the area surrounding its facility.

14. As such, local residents and workers in the area have unknowingly been exposed to carcinogenic ethylene oxide for decades, all while B. Braun knew, or should have known, that EtO is dangerous, toxic, carcinogenic, mutagenic, and the cause of various illnesses.

### II. Health Effects of Ethylene Oxide Exposure

15. Ethylene oxide is an odorless, colorless, gas that is dangerous, toxic, carcinogenic, and mutagenic. It is also highly reactive, readily taken up by the lungs, efficiently absorbed into

the blood stream, and easily distributed throughout the human body. Its deleterious properties have been widely known for decades.

16. In a 1977 article, the National Institute of Occupational Safety and Health ("NIOSH") concluded that occupational exposure to ethylene oxide may increase the frequency of genetic mutations in humans. The NIOSH report also raised a concern about the potential carcinogenicity of ethylene oxide.

17. In 1981, the NIOSH released a subsequent report which recommended that EtO be regarded in the workplace as a potential occupational carcinogen. The NIOSH based its recommendation on new evidence of EtO's carcinogenic, mutagenic and reproductive hazards, including studies demonstrating that EtO induced cancer in experimental animals. Specifically, the studies showed an increase in instances of leukemia in line with the increase of EtO concentrations, in addition to other adverse effects on reproductive health. An epidemiological investigation of Swedish workers exposed to EtO also revealed an increased incidence of leukemia and other cancers.

18. In 1985, the U.S. Department of Health and Human Services published the Fourth Annual Report on Carcinogens and classified EtO as reasonably anticipated to be a human carcinogen.

19. In the early 1990s, the NIOSH published the largest and most informative epidemiological study of ethylene oxide. The study analyzed over 18,000 employees working with EtO at fourteen different industrial facilities sterilizing medical equipment and food spices. The study found sufficient evidence to support a causal link between exposure to ethylene oxide and increased mortality from lymphatic and hematopoietic cancers. Follow-up studies have additionally demonstrated an association between EtO exposure and breast cancer.

20. In 1994, as a result of these findings, the World Health Organization ("WHO") listed EtO as a Group 1 human carcinogen—the agency's highest risk classification—finding ethylene oxide to be carcinogenic to humans. In 2000, following suit, the U.S. Department of Health and Human Services revised its EtO classification to "known to be a human carcinogen." In 2016, the EPA's Integrated Risk Information System similarly reclassified EtO as carcinogenic to humans and increased the cancer potency of EtO thirty-fold.

21. Exposure to ethylene oxide has been widely studied and its negative health effects well documented. Presently, there is evidence linking ethylene oxide exposure to increased risk of lymphohematopoietic cancers such as non-Hodgkin's lymphoma, myeloma, and lymphocytic leukemia; breast cancer; tumors in the lungs, uterus, and the brain; and reproductive and developmental impairments including an increased rate of miscarriages and infertility.

22. Most recently, the Illinois Department of Public Health ("IDPH") conducted an assessment of cancer rates in the population surrounding the Sterigenics facility in Willowbrook, Illinois, which has been using and emitting EtO in its industrial sterilization process since 1984. The findings reaffirm the decades of studies on EtO exposure. The IDPH found elevated cases of:

- Hodgkin's lymphoma;
- Pediatric lymphoma;
- Breast cancer;
- Prostate cancer;
- Pancreatic cancer;
- Ovarian cancer; and
- Bladder cancer.

23. Worst of all, ethylene oxide exposure affects the most vulnerable members of the population. The U.S. Environmental Protection Agency ("U.S. EPA") states that "for a single year of exposure to ethylene oxide, the cancer risk is greater for children than for adults. That is because ethylene oxide can damage DNA."

**III.   B. Braun Emits Harmful Ethylene Oxide**

   a.   **The U.S. EPA Estimates High Risks of Cancer in Lehigh County**

24. On August 22, 2018, the U.S. EPA released the 2014 National Air Toxics Assessment ("NATA")—a screening tool that estimates cancer risks based on emissions data in 76,727 census tracts across the United States.

25. The 2014 NATA revealed 109 census tracts in the United States with cancer risk scores greater than what the U.S. EPA considers "acceptable": 100 cancer cases per one million people exposed to toxic air pollution during their lifetime. Seventeen of those 109 census tracts directly surround the B. Braun facility in Allentown, Pennsylvania, and the surrounding counties. Additionally, thirty-eight other census tracks surrounding the facility showed more than double the national toxic air cancer risk of thirty cases per million:

- Tract 42077005902: **596 per million**
- Tract 42077000101: **347 per million**
- Tract 42077009200: **256 per million**
- Tract 42077005901: **242 per million**
- Tract 42077000102: **236 per million**
- Tract 42077005702: **159 per million**
- Tract 42077009300: **150 per million**
- Tract 42077009600: **147 per million**
- Tract 42077009100: **143 per million**
- Tract 42077005703: **134 per million**
- Tract 42095017702: **129 per million**
- Tract 42077000400: **128 per million**
- Tract 42077009400: **122 per million**
- Tract 42095017703: **120 per million**
- Tract 42095016300: **115 per million**
- Tract 42077000500: **108 per million**
- Tract 42077000700: **106 per million**
- Tract 42077000800: 99 per million
- Tract 42077000900: 94 per million
- Tract 42077009500: 92 per million
- Tract 42077001600: 91 per million
- Tract 42077005704: 91 per million
- Tract 42077001000: 90 per million
- Tract 42077006800: 89 per million
- Tract 42095010900: 87 per million
- Tract 42077001200: 87 per million
- Tract 42077001700: 83 per million
- Tract 42095010300: 83 per million
- Tract 42095010700: 83 per million
- Tract 42077006701: 81 per million

- Tract 42095010800: 78 per million
- Tract 42095011000: 78 per million
- Tract 42077000600: 78 per million
- Tract 42077001800: 78 per million
- Tract 42077009700: 76 per million
- Tract 42077001900: 75 per million
- Tract 42077005602: 73 per million
- Tract 42095010200: 73 per million
- Tract 42095011100: 73 per million
- Tract 42095010400: 71 per million
- Tract 42095010600: 70 per million
- Tract 42077002000: 70 per million
- Tract 42095010500: 69 per million
- Tract 42077001401: 68 per million
- Tract 42095011200: 66 per million
- Tract 42077005705: 65 per million
- Tract 42095017800: 65 per million
- Tract 42077002201: 64 per million
- Tract 42095016202: 64 per million
- Tract 42077002100: 63 per million
- Tract 42095017704: 63 per million
- Tract 42095011300: 62 per million
- Tract 42077001501: 62 per million
- Tract 42077002202: 62 per million
- Tract 42095017603: 61 per million

26.   The U.S. EPA "considers any exposure, however small, to a carcinogen to create some cancer risk."

27.   The U.S. EPA estimates the lifetime risk of developing cancer due to air toxicity in one of the tracts near the B. Braun facility to be up to *nineteen times higher* than the average national cancer risk across the U.S. population. Fewer than one percent of the census tracts in the U.S. have an estimated cancer risk due to air toxicity that measures up to the cancer risk in the seventeen tracts surrounding the B. Braun facility, with cancer risk scores greater than 100 cases per million.

b.   **B. Braun Emits High Levels of Ethylene Oxide**

28.   The U.S. EPA maintains a Toxics Release Inventory ("TRI") which includes annual self-reported emissions data from industrial facilities using EtO and other toxic chemicals that pose a threat to human health and the environment.

29.   A review of TRI data from the U.S. EPA shows reported EtO emissions from the B. Braun facility over the course of twenty years. *See* Figures 1 and 2.

7



**(Figure 1)**

| Year | Stack Emissions (in lbs) | Year | Stack Emissions (in lbs) |
|---|---|---|---|
| 1988 | 5 | 2003 | 225 |
| 1989 | 1 | 2004 | 1,176 |
| 1990 | 1 | 2005 | 449 |
| 1991 | 250 | 2006 | 504 |
| 1992 | 5,300 | 2007 | 1,784 |
| 1993 | 445 | 2008 | 1,873 |
| 1994 | 384 | 2009 | 8,960 |
| 1995 | 444 | 2010 | 2,026 |
| 1996 | 474 | 2011 | 4,920 |
| 1997 | 1300 | 2012 | 4,980 |
| 1998 | 2,381 | 2013 | 4,880 |
| 1999 | 241 | 2014 | 6,880 |
| 2000 | 233 | 2015 | 7,600 |
| 2001 | 938 | 2016 | 6,366 |
| 2002 | 234 | 2017 | 5,900 |
|  |  | 2018 | 4,664 |

**(Figure 2)**

30.     As the data reveals, B. Braun has consistently emitted, on average, nearly 5,000 pounds of carcinogenic ethylene oxide from its facility over the last decade. In 2009 alone, B. Braun emitted 8,960 pounds of EtO.

8

31. Importantly, the B. Braun facility emits ethylene oxide to a degree that poses a health risk to individuals living and working in the area. In fact, based on its 2014 emissions, the B. Braun facility ranked as the 6th largest EtO emitter in the nation.[1]

### IV. Plaintiff and Class Members Have Suffered Harm and Require Ongoing Diagnostic Testing

32. Ethylene oxide is known to cause serious illnesses including, without limitation, blood cancers and breast cancers. As a result, through Defendant's release of ethylene oxide, Plaintiff and members of the Class have a significantly increased risk of contracting one or more illnesses as described above.

33. Indeed, and unbeknownst to them, Plaintiff and Class Members have endured exposure to EtO at levels significantly more hazardous than the general public and as a result are at a significantly greater risk of developing cancer as compared with the general population.

34. Plaintiff and the Class have been exposed to EtO at levels that make it reasonably necessary for them to undergo periodic diagnostic medical examinations different from what would be prescribed in the absence of their exposure. Monitoring procedures exist in the contemporary medical field that make possible the early detection of cancer, the disease progression of cancer, and the presence of biomarker abnormalities that indicate that development of cancer.

35. These diagnostic tests for the early detection of signs or symptoms of cancer are medically necessary to assure early diagnosis, effective treatment, and to mitigate the risks of onset disease.

---

[1] Dan West, *Action Needed to Protect Americans from Toxic EtO Pollution*, NRDC, Feb. 14, 2019, https://www.nrdc.org/experts/dan-west/action-needed-protect-americans-toxic-eto-pollution (last visited Feb. 26, 2020).

36. Accordingly, Plaintiff and Class Members seek as damages the costs of such diagnostic testing and medical monitoring, in order to detect the early onset of disease. This testing will in turn identify the need for treatment, management and rehabilitation in the event cancer is detected and Plaintiff and/or any Class Members are diagnosed.

### FACTS SPECIFIC TO PLAINTIFF AKARSOY

37. Plaintiff Adam Akarsoy has been a resident of Lehigh County since 2012. Akarsoy lives approximately two miles from the B. Braun facility, and works on the same street as B. Braun.

38. Due to B. Braun's emissions of ethylene oxide in the community, Plaintiff Akarsoy, like many other residents of Lehigh County and the surrounding counties, has been living with and inhaling carcinogenic ethylene oxide for years, without any knowledge that he was doing so.

39. As such, Plaintiff, until recently, had no reason to believe he was being subjected to an increased risk of cancer.

40. In fact, and regrettably, Plaintiff resides in a census track where the U.S. EPA has estimated a cancer risk of 134 per million—over four times higher than the national average cancer risk—and works in a census track where the U.S. EPA has estimated a cancer risk of 596 per million.

### CLASS ACTION ALLEGATIONS

41. **Class Definition**: Plaintiff Adam Akarsoy brings this action pursuant to Federal Rule of Civil Procedure 23(b)(2) and Rule 23(b)(3) on behalf of himself and a Class of similarly situated individuals, defined as follows:

> All individuals who have resided within the census tracts listed in ¶ 25 for a period of one year or more since the B. Braun facility began emitting ethylene oxide.

Excluded from the Class are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest, and its officers, and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

42. **Numerosity**: The exact number of Class Members is unknown and not available to Plaintiff at this time, but it is clear that individual joinder is impracticable. On information and belief, over 24,000 individuals fit within the definition of the Class according to 2010 census data.

43. **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiff and the putative Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include, but are not limited to, the following:

    a.    Whether Defendant's conduct was negligent;

    b.    Whether Defendant owed a duty of care to Class Members;

    c.    Whether the duty of care owed to the Class included the duty to prevent their exposure to unsafe, unnecessary and high levels of EtO emissions;

    d.    Whether Defendant breached its duty to the Class by exposing them to high levels of EtO and thus increasing their risk of contracting various illnesses;

    e.    Whether medical monitoring and early diagnostic detection is reasonably

     necessary to protect the Class; and

  f.  Whether Plaintiff and Class Members are entitled to relief.

44. **Typicality:** Plaintiff's claims are typical of the claims of the other members of the Class in that Plaintiff and the members of the Class sustained damages arising out of Defendant's uniform wrongful conduct.

45. **Adequate Representation:** Plaintiff will fairly and adequately represent and protect the interests of the Class and has retained counsel competent and experienced in complex litigation and class actions. Plaintiff's claims are representative of the claims of the other members of the Class. That is, Plaintiff and the Class Members sustained damages as a result of Defendant's conduct and toxic emissions of ethylene oxide. Plaintiff also has no interests antagonistic to those of the Class, and Defendant has no defenses unique to Plaintiff. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the members of the Class and have the financial resources to do so. Neither Plaintiff nor his counsel has any interest adverse to the Class.

46. **Superiority**: Class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy, as joinder of all members of the Class is impracticable. Individual litigation would not be preferable to a class action because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered, and uniformity of decisions will be ensured.

47. Plaintiff reserves the right to revise the foregoing "Class Allegations" and "Class

Definition" based on facts learned through additional investigation and in discovery.

## COUNT I
### Negligence
**(On Behalf of Plaintiff and the Class)**

48. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

49. At all times relevant, Defendant owed a duty to exercise reasonable care in the operation of its facility, including the emission of EtO.

50. Notwithstanding its duty, Defendant breached its duty in one or more of the following ways:

    a. Emitting dangerous volumes of EtO into the air from its facility;

    b. Disregarding safe methods to adequately control EtO emissions from its facility;

    c. Controlling and accurately reporting fugitive emission of EtO;

    d. Failing to warn or advise those who live or work in the community that they were being exposed to EtO; and

    e. Subjecting those who live and work nearby its facility to an elevated cancer risk.

51. As a proximate result of one of the aforesaid negligent acts or omissions, Plaintiff and the Class Members suffered injuries of a personal and pecuniary nature.

## COUNT II
### Willful and Wanton Misconduct
**(On Behalf of Plaintiff and the Class)**

52. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

53. At all times relevant, Defendant owed a duty to refrain from willful and wanton misconduct and/or conduct which exhibited an indifference and/or conscious disregard to the

health, safety and well-being of Plaintiff and those living and working in the area surrounding its facility.

54. Notwithstanding its duty, Defendant breached its duty in one or more of the following ways:

    a. Emitting dangerous volumes of EtO into the air from its facility;

    b. Disregarding safe methods to adequately control EtO emissions from its facility;

    c. Controlling and reporting fugitive emission of EtO;

    d. Failing to warn or advise those who live or work in the community that they were being exposed to EtO; and

    e. Subjecting those who live and work nearby its facility to an elevated cancer risk.

55. As a proximate result of one of the aforesaid negligent acts or omissions, Plaintiff and the Class Members suffered injuries of a personal and pecuniary nature.

## COUNT III
### Public Nuisance
### (On Behalf of Plaintiff and the Class)

56. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

57. The right of enjoyment of private property is an absolute right of every citizen.

58. Ethylene oxide is a human carcinogen. Defendant knew EtO to be hazardous and harmful to humans.

59. Defendant knew or should have known that the levels of EtO gas emitted from its facility would have a toxic, poisonous, and deleterious effect upon the health, safety and well-being of people living and working in the community.

60. Indeed, the operation and use of a sterilization facility that emits large volumes of carcinogenic ethylene oxide into a surrounding residential community is an unreasonable, unusual and unnatural use of the facility.

61. Defendant's operation, maintenance and use of its sterilizing facility caused those who live and work in the area surrounding its facility to breathe air containing high levels of EtO on a routine and consistent basis, causing a substantially elevated risk of cancer.

62. Defendant's emissions of carcinogenic EtO interfered with Plaintiff's and Class Members' enjoyment of their property and caused hurt, inconvenience and damage to Plaintiff and the Class.

63. Defendant's operation, maintenance and use of its sterilizing facility eliminated and/or severely diminished Plaintiff's and Class Members' right to breathe clean air without dangerous levels of carcinogens such as EtO.

64. Defendant's operation, maintenance and use of its sterilizing facility continuously invaded and contaminated the areas surrounding the Defendant's facility, including Plaintiff's and Class Members' residences, with carcinogenic EtO. Furthermore, Defendant's EtO emissions caused Plaintiff and the Class Members to inhale great amounts of toxic EtO.

65. As a result, Defendant not only interfered with Plaintiff's and Class Members' right to enjoy their property, but also subjected them to an increased risk of cancer.

### COUNT IV
### Ultrahazardous Activity/Strict Liability
### (On Behalf of Plaintiff and the Class)

66. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

67. Defendant's use and emission of EtO from its medical sterilization facility constitutes an ultrahazardous activity.

68.     Defendant's use and emission of EtO created a high degree of risk to those who live and work in the surrounding area. Further, the likelihood of cancer caused by Defendant's use and emission of EtO is significantly higher than the level of acceptable risk.

69.     Defendant's use and emission of EtO is especially inappropriate given the densely populated residential and commercial area in which its facility is located.

70.     These activities, as conducted by Defendant, are exceedingly dangerous and offer little to no value to the surrounding community.

71.     Because Defendant's activities are ultrahazardous, it is strictly liable for any injuries proximately resulting therefrom.

72.     As a direct and proximate result of Defendant's ultrahazardous activities, Plaintiff and the Class were exposed to and inhaled great amounts of EtO.

73.     As a proximate result of Plaintiff's and Class Members' inhalation of EtO from Defendant's facility, Plaintiff and the Class suffered injuries of a personal and pecuniary nature.

## COUNT V
## Medical Monitoring
### (On Behalf of Plaintiff and the Class)

74.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

75.     EtO is a dangerous toxin that has been proven to cause cancer in humans.

76.     Defendant tortuously emitted EtO from its facility in amounts that are far higher and more hazardous than the acceptable standard.

77.     Plaintiff and Class Members were significantly exposed to EtO due to Defendant's tortious actions.

78. As a proximate result of their exposure to EtO, Plaintiff and Class Members have a significantly increased risk of developing several types of cancer and other illnesses, including but not limited to, blood cancers, breast cancers, tumors, and reproductive issues.

79. This increased risk makes periodic diagnostic medical examinations reasonably necessary.

80. Monitoring and diagnostic procedures exist that make early detection of these cancers possible and beneficial.

81. These monitoring and diagnostic procedures are different than those normally recommended in the absence of exposure to toxic gas such as EtO and are reasonably necessary due to Plaintiff's and Class Members' significant exposure to EtO.

82. As a result, Plaintiff and the Class should be awarded the costs of such a monitoring regime.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff, individually and on behalf of the Class, requests that the Court enter judgment in their favor and against Defendant as follows:

    a. An Order certifying the Class as defined herein and appointing Plaintiff and his Counsel as representatives of the Class;

    b. An award of damages, including nominal and compensatory damages, as allowed by law and in an amount to be determined;

    c. An Order creating a fund for a medical monitoring program in an amount determined to be just and reasonable;

    d. An award of punitive damages as allowed by law and in an amount to be determined;

e. An award of attorneys' fees, costs and litigation expenses;

f. An award of prejudgment interest on all amounts awarded;

g. An Order for injunctive and declaratory relief; and

h. Such other and further relief as this Court may deem just and proper.

## JURY TRIAL

Plaintiff demands a trial by jury for all issues so triable.

Respectfully submitted,

**ADAM AKARSOY,**

By: /s/ David S. Senoff
One of Plaintiff's Attorneys

DAVID S. SENOFF
DSENOFF@FIRSTLAWSTRATEGY.COM
HILLARY B. WEINSTEIN
HWEINSTEIN@FIRSTLAWSTRATEGY.COM
FIRST LAW STRATEGY GROUP, LLC
121 S. BROAD STREET, SUITE 300
PHILADELPHIA, PA 19107
TEL: 215.258.4700
FAX: 215.258.4777

JAY EDELSON*
JEDELSON@EDELSON.COM
BENJAMIN H. RICHMAN*
BRICHMAN@EDELSON.COM
IMAN BOUNDAOUI*
IBOUNDAOUI@EDELSON.COM
MICHAEL OVCA*
MOVCA@EDELSON.COM
EDELSON PC
350 NORTH LASALLE STREET, 14TH FLOOR
CHICAGO, ILLINOIS 60654
TEL: 312.589.6370
FAX: 312.589.6378

DATED: MARCH 6, 2020        * *PRO HAC VICE* ADMISSION TO BE SOUGHT